STATE of Minnesota, City of
Shorewood, Petitioners,
Appellant,

v.

Richard Gordon GRAY, Jr.,
Respondent.

No. C5–86–2047.

Supreme Court of Minnesota.

Oct. 2, 1987.

Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Glen Froberg, Shorewood City Atty., Minnetonka, for appellant.

Peter Thompson, Minneapolis, for respondent.

Elizabeth A. Hughes, Thomas W. Strahan, William J. Keppel, Thomas A. Pearson, Minneapolis, David W. Ogden, Jordan W. Lorence, Washington, D.C., for amicus curiae.

AMDAHL, Chief Justice.

On December 2, 1986, a Hennepin County trial court dismissed a complaint charging respondent Richard G. Gray, Jr., with sodomy in violation of Minn.Stat. § 609.-293, subd. 5 (1986). The complaint was dismissed on the ground that section 609.-293, the sodomy statute, is unconstitutionally broad and infringes on its face and as applied to Gray upon the right of privacy guaranteed by the Minnesota Constitution. We accepted the state's petition for accelerated review of the trial court's order; we reverse and remand to the trial court for trial or other disposition.

In July 1986, Gray was charged with one count of sodomy in violation of section 609.-293, subdivision 5. The complaint alleges that on May 16, 1986, upon the apprehension of a suspect, the complainant, in connection with the reported boat theft from Gray's residence, the police learned that the complainant, a 16–year–old boy, and Gray had engaged in three separate acts of sodomy during April and May 1986, and that on at least one occasion the complainant had been paid for the sodomous act; that all of the sodomous acts took place in the bedroom of Gray's residence; and that Gray in a signed voluntary statement admitted to having had sexual contact with the complainant on one occasion.

Prior to the filing of the complaint, both Gray and the complainant gave statements to the police. In Gray's statement, Gray stated that he met the complainant while driving in Minneapolis; that the complainant said he was 18 years old; that he saw the complainant a total of four times but had only one sexual contact with the complainant; that he never paid the complainant for sex, rather he "loaned" him money; and that he believed the complainant to be an adult.

The complainant gave the police a statement in mid-May, immediately following his apprehension in connection with the boat theft from Gray, and another in early June. The substance of the two statements is identical except that in the later statement the complainant changed his account of the dates of the sexual contacts and the amount of money paid to him by Gray. In his earlier statement, the complainant stated that the three sexual contacts between him and Gray took place in May 1985; in his later statement, the complainant stated that the sexual contacts took place in April and May of 1986. The complainant explained that the reason he originally said the contacts took place in 1985 was that he had been charged with prostitution in May 1985, and he did not want anyone to know he had engaged in prostitution after May 1985. With respect to the amount of money he was paid by Gray, in his earlier statement the complainant estimated that he received $125 from Gray on two occasions and $40 on a third occasion. In his

later statement, the complainant stated that he initially received $40 from Gray and later received $180; the complainant explained that the misstatement was due to confusion caused by drinking.

Except for his account of the dates and the money, the complainant's two statements are substantially the same. The complainant stated that he was picked up by Gray near Loring Park;[1] that when he was picked up by Gray, Gray told him that he would pay for sex; that Gray asked how old he was, and he told Gray he was 18;[2] that he and Gray drove to Gray's house where, in the bedroom, Gray committed a sodomous act upon him; that he was paid by Gray for this incident; that he and Gray then exchanged phone numbers, and about one week later he called Gray, Gray picked him up at a store, he went with Gray back to Gray's home; that in the bedroom of Gray's home Gray committed a sodomous act upon him, and that again he was paid by Gray for this incident; and that he and Gray had a third sexual contact, initiated by Gray calling him, involving mutual acts of fellatio. In his statement, in response to questioning, the complainant stated that he considered his sexual relations with Gray to be acts of prostitution for the reason that "Gray offered me money for sex."

On September 24, 1986, Gray moved to dismiss the complaint on the ground that section 609.293, subdivision 5 is unconstitutional as violative of the constitutional right of privacy protected by both United States Constitution and the Minnesota Constitution. In his memorandum of law in support of the motion, Gray argued that the "criminalization of private, consensual sexual conduct is contrary to the Minnesota and United States Constitutions;" accordingly, the sodomy statute is unconstitutional.

On June 30, 1986, about three months before Gray moved to dismiss the complaint, the United States Supreme Court decided the case of *Bowers v. Hardwick*, — U.S. —, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), *reh'g denied* — U.S. —, 107 S.Ct. 29, 92 L.Ed.2d 779. In that case, Hardwick, an adult male, was found committing an act of sodomy with another adult male in the bedroom of Hardwick's home, and he was charged with violating the Georgia statute criminalizing sodomy.[3] After a preliminary hearing, the District Attorney's office decided not to present the matter to the grand jury unless further evidence developed.

Hardwick then filed suit in the federal district court, asking the court to declare the Georgia statute unconstitutional insofar as it criminalized consensual sodomy. Hardwick was joined in bringing the suit

1. We recognize that Loring Park is "a public place, a place notoriously frequented by young prostitutes." *In re Winton*, 350 N.W.3d 337, 343 (Minn.1984).

2. In his first statement to the police, the complainant said that he told Gray that he was 18; the complainant then commented: "If he was a retard he would believe that."

   The record discloses that Gray had a reason for asking the complainant his age; at the time of his contacts with the complainant, Gray was on probation for a December 17, 1984, conviction for the crime of criminal sexual conduct in the third degree. Gray's conviction rested on his having committed acts of fellatio with a boy who was between the ages of 13 and 16 and who was Gray's little brother in the Big Brother program.

3. The portion of the Georgia sodomy statute under which Hardwick was charged is, with the exception of the penalty provision, substantially similar to the Minnesota sodomy statute under which Gray was charged.

The Georgia statute provides, in pertinent part, as follows:
(a) A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another. * * *
(b) A person convicted of the offense of sodomy shall be punished by imprisonment for not less than one nor more than 20 years. * *
Ga. Code Ann. § 16–6–2 (1984).
The Minnesota statute provides as follows:
Subdivision 1. Definition. "Sodomy" means carnally knowing any person by the anus or by or with the mouth.

   *     *     *     *     *     *

Subd. 5. Consensual acts. Whoever, in cases not coming within the provisions of sections 609.342 or 609.344, voluntarily engages in or submits to an act of sodomy with another may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3,000, or both.
Minn.Stat. § 609.293 (1986).

by John and Mary Doe. The Does, a married couple, alleged that they desired to engage in the prohibited activity in the privacy of their home, but that they had been "chilled and deterred" from doing so by the existence of the statute and by Hardwick's arrest.

With respect to Hardwick, the federal district court ruled that Hardwick did have standing to bring suit, but then dismissed the suit for failure to state a claim.

With respect to the Does, the federal district court held "that because they had neither sustained, nor were in immediate danger of sustaining, any direct injury from the enforcement of the statute, they did not have proper standing to maintain the action." *Hardwick*, 106 S.Ct. at 2842, n. 2.

Hardwick and the Does then appealed the decision of the district court. The federal court of appeals affirmed the district court's dismissal of the Does' claim for the lack of standing, *id.* 106 S.Ct. at 2842, n. 2; however, the court reversed and remanded for trial with respect to Hardwick, holding, in the words of the Supreme Court, "that the Georgia statute violated [Hardwick's] fundamental rights because his ·homosexual activity is a private and intimate association that is beyond the reach of state regulation by reason of the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment." *Id.* 106 S.Ct. at 2843. The Supreme Court granted certiorari, and in a 5–4 decision,[4] it reversed the court of appeals' decision. The Supreme Court did not address the holding that the Does lacked standing, due to the Does' failure to challenge that holding in the Court. Thus, "[t]he only claim properly before the Court, * * * [was] Hardwick's challenge to the Georgia statute as applied to consensual homosexual sodomy." *Id.* 106 S.Ct. at 2842, n. 2.

The United States Supreme Court held that its prior cases have not "construed the Constitution to confer a right of privacy that extends to homosexual sodomy * * *." *Id.* 106 S.Ct. at 2843. After sketching the reach of its previous right of privacy cases, the Court stated:

Accepting the decisions in these cases and the above description of them, we think it evident that none of the rights announced in those cases bears any resemblance to the claimed constitutional right of homosexuals to engage in acts of sodomy that is asserted in this case. No connection between family, marriage, or procreation on the one hand and the homosexual activity on the other has been demonstrated, either by the Court of Appeals or by respondent. Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable. *Id.* 106 S.Ct. at 2844.

The Supreme Court's decision in *Hardwick* was, of course, dispositive of and wiped out Gray's argument that section 609.293, subdivision 5 violates the Federal Constitution. Thus, the Hennepin County trial court had before it only the claim that the sodomy statute violated the Minnesota Constitution. The trial court held that "Minn.Stat. § 609.293, subd. (5) is unconstitutionally broad and infringes upon the right of privacy granted by the Minnesota Constitution on its face and· as applied to [Gray]," and it dismissed the complaint. The state appealed and petitioned for accelerated review, and we granted its petition.

We begin by noting that while we have discussed the constitutionally protected right of privacy in numerous cases, we have never rooted that right in the Minnesota Constitution. *See e.g., Minnesota State Board of Health v. City of Brainerd*, 308 Minn. 24, 241 N.W.2d 624 (1976), *appeal dismissed* 429 U.S. 803, 97 S.Ct. 35, 50 L.Ed.2d 63; *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905 (1976).

---

4. Justice White wrote the majority opinion in which Chief Justice Burger and Justices Rehnquist, Powell and O'Connor joined. Chief Justice Burger and Justice Powell, in addition, each wrote a concurring opinion.

Justice Blackmun wrote a strongly worded dissent in which Justices Brennan, Marshall, and Stevens joined. Justice Stevens, in addition, wrote a dissent in which Justices Brennan and Marshall joined.

■ The constitutionally protected right of privacy was first explicitly recognized by the United States Supreme Court in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Since *Griswold,* the Supreme Court has continued to recognize the right of privacy as a constitutionally protected right, although it has never isolated the precise source of that right. *See Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973), *reh'g denied* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694. A comparison of the Minnesota Bill of Rights with the federal constitutional provisions upon which the right of privacy is founded shows that the rights protected by the Federal Constitution are also protected by the Minnesota Bill of Rights. Accordingly, it is our opinion that there does exist a right of privacy guaranteed under and protected by the Minnesota Bill of Rights.

Having recognized the existence of a right of privacy under the Minnesota Bill of Rights, we must articulate the scope of protection afforded by that right. In this respect, we agree with the United States Supreme Court that the right of privacy protects only fundamental rights. *See Roe,* 410 U.S. at 152, 93 S.Ct. at 726. Consequently, a law must impermissibly infringe upon a fundamental right before it will be declared unconstitutional as violative of the right of privacy. Having stated this rule, we now turn to a characterization of fundamental rights under our constitution.

Fundamental rights are "[t]hose which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms." Black's Law Dictionary 607 (Rev. 5th ed. 1979).

■ In deciding whether a right alleged to be fundamental is indeed fundamental, under our Constitution, we are not limited by United States Supreme Court decisions. Certainly, the protection we afford cannot be less than that afforded by the Federal Constitution, but it is equally certain that we can afford more protection under our constitution than is afforded under the Fed-eral Constitution. In *State v. Fuller,* 374 N.W.2d 722 (Minn.1985), we said it best:

It is axiomatic that a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution. Indeed, as the highest court of this state, we are " 'independently responsible for safeguarding the rights of [our] citizens.' " State courts are, and should be, the first line of defense for individual liberties within the federalist system. This, of course, does not mean that we will or should cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution.

*Id.* 374 N.W.2d at 726–27 (citations omitted).

■ Furthermore, we have not limited our finding of fundamental rights to those expressly stated in our constitution; this, of course, is consistent with the definition of fundamental rights. In *Thiede v. Town of Scandia Valley,* 217 Minn. 218, 14 N.W.2d 400 (1941), Justice Streissguth wrote so eloquently:

The entire social and political structure of America rests upon the cornerstone that all men have certain rights which are inherent and inalienable. Among these are the right to be protected in life, liberty, and the pursuit of happiness; the right to acquire, possess, and enjoy property; and the right to establish a home and family relations—all under equal and impartial laws which govern the whole community and each member thereof. The rights, privileges, and immunities of citizens exist notwithstanding there is no specific enumeration thereof in state constitutions. "These instruments measure the powers of rulers, but they do not measure the rights of the governed." "The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." Government would not be free if they were not so held.

The constitution of Minnesota specifically recognizes the right to "life, liberty

or property" (art. 1, § 7), but does not attempt to enumerate all "the rights or privileges secured to any citizen thereof" (see art. 1, § 2). It, however, significantly provides: "The enumeration of rights in this constitution shall not be construed to deny or impair others retained by and inherent in the people." (Art. 1, § 16). *Id.* 217 Minn. at 224–25, 14 N.W.2d at 405 (citations omitted).

Having laid out the analytical framework, we now turn to a consideration of this case. In determining the constitutionality of section 609.293, subdivision 5, we are, as was the Court in *Hardwick* limited to a consideration of the facts of this particular case. The trial court held that the sodomy statute is both unconstitutional as applied and facially overbroad. In ruling that the sodomy statute is facially overbroad the trial court overextended itself for the reason that in this case Gray has no standing to champion the causes of others in situations not before this court. *Cf. State v. Hanson,* 364 N.W.2d 786, 789 (Minn.1985) ("Gordon has no right to complain about any violation of Melvin's rights and Melvin has no cause to complain, since he was not prosecuted * * *.").

The rule is well settled that in order for one to challenge a statute as overbroad, the person must have standing.

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously.
>
> \*   \*   \*   \*   \*   \*
>
> In the past, the Court has recognized some limited exceptions to these principles, but only because of the most "weighty, countervailing policies." One such exception is where individuals not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves. Another exception has been carved out in the area of the First Amendment.

*Broadrick v. Oklahoma,* 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2914–15, 37 L.Ed.2d 830 (1973) (citations omitted); *see also State v. Hipp,* 298 Minn. 81, 86–87, 213 N.W.2d 610, 614 (1973).

Before this court, Gray argues that he has standing to challenge the constitutionality of the sodomy statute not only as applied to him, but as applied to others, in situations not before this court. Relying on *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), Gray contends that he has standing to challenge the statute as being facially overbroad because "the rule against assertion of third-party rights 'must be relaxed' [*Eisenstadt,* 405 U.S. at 445, 92 S.Ct. at 1034] because of the 'impact of the litigation on the third-party interests' [*id.* [405 U.S.] at 446, 92 S.Ct. at 1034]."

Gray's reliance on *Eisenstadt* is misplaced; that case is not dispositive of the standing issue. In *Eisenstadt,* Baird, who was neither a registered physician nor pharmacist, gave a young woman an item used for the prevention of conception. He was subsequently prosecuted under a Massachusetts statute whose provisions made it a felony "for anyone, other than a registered physician or pharmacist * * *, to dispense any article [to an unmarried person] with the intention that it be used for the prevention of conception." *Eisenstadt,* 405 U.S. at 442, 92 S.Ct. at 1032. The Supreme Court held that the statute "viewed as a prohibition on conception *per se,* violates the rights of single persons under the Equal Protection Clause of the Fourteenth Amendment." *Id.* 405 U.S. at 443, 92 S.Ct. at 1033. Baird, who may or may not have been single, was afforded standing to assert the constitutional rights of single persons principally because unless standing was granted Baird, the group constitutionally affected—single persons—would never have been afforded an opportunity to challenge the statute; the Massachusetts statute did not subject single persons to prosecution and, to that extent,

they were "denied a forum in which to assert their own rights." *Id.* 405 U.S. at 446, 92 S.Ct. at 1034.

Unlike *Eisenstadt,* persons not currently before this court not only do not stand to lose by the outcome of this case, but they retain an "effective avenue of preserving their rights themselves." Thus, the *Eisenstadt*-type exception to the standing principle is not applicable.

■ Another exception to the standing principle has been carved out in the area of the First Amendment. When First Amendment rights are involved, courts are willing to allow the party in court to champion the cause of others in situations not before the court.

> This rule is recognized because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." The United States Supreme Court has reasoned that such standing is necessary "because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression."

*Koppinger v. City of Fairmont,* 311 Minn. 186, 200, 248 N.W.2d 708, 716 (1976) (citations omitted).

In the case before us, the argument made in favor of standing is that the first amendment protects the right of association, and the sodomy statute infringes upon the right of association; thus, says the argument, the first amendment exception is applicable and Gray has standing to challenge the sodomy statute as being overbroad.

The United States Supreme Court has discussed constitutional protection to freedom of association in two distinct senses, "freedom of intimate association" and "freedom of expressive association." *See Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d

462 (1984); and *Board of Directors of Rotary International v. Rotary Club of Duarte,* —— U.S. ——, 107 S.Ct. 1940, 1945–48, 95 L.Ed.2d 474 (1987). However, whether the freedom of intimate association is constitutionally protected under the first amendment or as an intrinsic element of personal liberty is a matter we need not decide for the reason that our decision in either case is the same. Standing principles are based not on constitutional directive but on prudential principle, *see Warth v. Seldin,* 422 U.S. 490, 499–501 n. 12, 95 S.Ct. 2197, 2205–2206 n. 12, 45 L.Ed.2d 343 (1975), and the Court has cautioned that the first amendment overbreadth doctrine is "strong medicine" to be employed with hesitation, and then "only as a last resort." *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). In this case we do not consider it necessary to afford Gray standing to challenge the sodomy statute as being facially overbroad; our decision in this case will not affect persons in situations not before this court so directly that their interests must be considered.

■ Our inquiry is, therefore, reduced to a consideration of the particular facts currently before the court. The question is whether the sodomy statute, as applied to Gray in this case, unconstitutionally violates the right of privacy. Because the right of privacy protects only fundamental rights, Gray characterizes the fundamental right involved in this case to be the right of consenting adults to engage in private sexual conduct within the privacy of the home. We disagree. Without addressing the question of whether the complainant was properly characterized as an adult,[5] our disagreement centers on Gray's attempt to characterize this as a case involving private sexual conduct.

While this case is not "public" in the sense that the sodomous acts were performed, say, on stage or out-of-doors, it is public in every other way: Gray picked up the complainant, who was previously un-

---

**5.** Although the complainant was 16 years old at the time of his sexual contacts with Gray, the trial court found that because the complainant had represented that he was 18, and because

Gray reasonably assumed the complainant was a consenting adult, the complainant would be considered a consenting adult.

known to Gray, at or near a public park recognized as a gathering place of young prostitutes; the sexual contacts between the two were essentially no more than separate "one night stands" (and if, as Gray stated, the two committed only one sodomous act, our perception of the contact as a one night stand is bolstered); and, most importantly, this is a case of sex for compensation.

It is simply wrong to say that the sexual conduct in this case became private once the bedroom door was closed. Given the public nature of this case, the closing of the bedroom door did not insulate the activity from the law. Were we to draw a line at the bedroom door, we would be hard pressed, once presented with the issue, to say that statutes criminalizing prostitution do not violate the right of privacy, and this is something we are quite unwilling to do for reasons well stated by the Iowa Supreme Court in *State v. Price*, 237 N.W.2d 813, 818 (Iowa 1976), *appeal dismissed* 426 U.S. 916, 96 S.Ct. 2619, 49 L.Ed.2d 370:

> Prostitution implicates more than private sexual relations between consenting adults. It affects others including the community. Although usually transacted in private, it is nevertheless business which is frequently negotiated in public. Although intimate, it is impersonal. Although involving only consenting adults at the time, it may be a factor in the spread of venereal disease or have a close relationship with other criminal activity.

*See also State v. Kelly*, 379 N.W.2d 649 (Minn.App.1986); *State v. Ketter*, 364 N.W.2d 459 (Minn.App.1985).

While we are aware that neither Gray nor the complainant was charged with the offense of prostitution, this fact does not in some way limit our ability to review the facts. The facts involved would sustain a charge of prostitution against either Gray or the complainant, and the lack of a charge does not erase from our review the fact of its occurrence.

In sum, to say that there exists a fundamental right under our constitution to engage in sodomous acts within a sex for compensation relationship and there-

fore afford this activity constitutional protection under the right of privacy, is not only to extend that privacy right far beyond constitutional cases, but it is to debase both the Constitution and the concept of fundamental rights.

Therefore, we decline the invitation to expand our state constitutional protection by way of creating a fundamental right of privacy which protects those who engage in commercial sex; accordingly, as applied to Gray, section 609.295, subdivision 5, does not violate the right of privacy.

We emphasize that nothing in the court's opinion, either expressly or impliedly, expands the individual's right of privacy under the Minnesota Constitution beyond the parameters established for that right by the United States Supreme Court under our Federal Constitution. Today's decision is limited to a holding that any asserted Minnesota constitutional privacy right does not encompass the protection of those who traffic in commercial sexual conduct. Whether the scope of any privacy right asserted under the Minnesota Constitution should be expanded beyond federal holdings remains to be resolved in future cases wherein the issue is properly raised. We thus reverse the holding of the trial court, reinstate the complaint, and remand for trial or other disposition.